Please be seated. It's always good to see familiar faces. Afternoon all. You're getting way too familiar with this hour. Good morning ladies. Ms. Skelnick, do you want to begin? I guess I should say good afternoon. Good afternoon, Your Honor, counsel. It is the court, Josette Skelnick, appearing on behalf of the defendant Roll White. Mr. White was convicted after a bench trial of two offenses, armed habitual criminal and unlawful sale of a firearm to a felon. The latter conviction was based on his girlfriend Stephanie's sale of a firearm to Aldo Grano at a time when the defendant himself was not present. And because he was not present, the defendant's conviction for this offense was based on a theory that he was accountable for Stephanie's sale of the firearm to Aldo. We're asking that this conviction be reversed for two separate reasons. First, that the evidence failed to establish that with the intent to promote or facilitate Stephanie's commission of the offense, the defendant solicited, aided or abetted Stephanie in her sale of the gun to Aldo. Second, any accountability on Mr. White's part had to flow from Stephanie's own guilt as the principal in the offense. And in this case, the state failed to establish that Stephanie knew that Aldo Grano was a felon. And since she could not be found guilty of that offense, the defendant could not consequently be convicted of that offense as an accomplice. Does she have to know or is it sufficient that he knows that the gun is being sold to a felon? Well, I think with respect to that issue, I think this court's decision in Cicciarillo is appropriate. Isn't Cicciarillo, though, isn't that the – that's a little different than it is here. Here it's accountability. Cicciarillo is – was the – whether or not – Was the defendant. Was the defendant who had a felony conviction, was the co-defendant going to be charged with the same status as the co-defendant? So that's a little different than here, isn't it? Right, but the offense of unlawful sale of a weapon to a felon says that the defendant must knowingly sell to a felon. And if Stephanie is not aware – or if there's no proof, at least, that Stephanie is not aware he's a felon, what you're essentially punishing is innocent behavior. So – and it's clear that people – I beg to differ to the extent that I don't think it's legal to sell guns to people in the manner in which this was sold. Well, under the statute, for example, there's other ways of committing it, like selling a firearm to somebody. Well, you have to look to see if they even have a FOIA card before you transfer it. And then you're supposed to keep a record of it for five years. Right, but that isn't what was charged with here. No, but what you said was an innocent sale. And my point is, is that the fact that they were or weren't charged with some basis that would prove beyond a shadow of a doubt that it was not a legitimate sale doesn't mean that it is now a legitimate sale. What I'm curious about is, if I were to accept your syllogism, then it would suggest to me that in drug dealings and other situations, someone could tell someone to go stand out on the street and give this person that's going to stand out in the middle of the street or on the curb a stuffed teddy bear in which any amount of drugs or contraband are present, and just say, sell the teddy bears. And so they sell the teddy bears. Now, whether or not you could prove that the person on the curb is committing a crime would seem to me that if a police officer arrested that person and said to that person, who gave you these teddy bears to sell, and she said Joe Blow, I think it would be pretty easy for the state to prove that Joe Blow was selling drugs. Whether or not they could prove that the person on the street was naive and stupid and he didn't know it and so on. Well, let me say in that respect, that case is not like this case because we also... It's a teddy bear, not a shotgun. Pardon? No, no, because in this case, there is not any evidence that Merle White directed Stephanie to complete the sale of the gun to her. Well, when he jumped out of the car, he didn't say the gun's under the hood. He said the gun's under the hood, but that wasn't to go sell the gun to Aldo, finish up the sale. And there's other facts in the record that I think preclude coming to that conclusion, specifically from Stephanie herself, and from Aldo even for that matter. There's no indication. In fact, Stephanie said she didn't even know where the sale was going to be taking place. She didn't even know the Addison area. We don't even know if she knew Aldo's phone number. Are you saying that this was a sale by her and not by him? Correct. Then why did she give him the money? Because she's his girlfriend. She's the nicest girlfriend you think I've ever heard of? I wouldn't agree with that, Your Honor. I'm not doubting, I'm not disputing that he, at least in the short term, he benefited from the fact that she completed the sale. In fact, she didn't even interpret his comments to her as finish up this sale. She said, I can't recall if it was the prosecutor or defense counsel who asked her, but one person asked her, basically, why did you go ahead and sell the gun? And she said, because I was riding around in a car that the police knew about with the defendant's son, and there was a gun in the car, and I didn't want to keep that gun in the car for my own safety. So the evidence does reflect that she did this independently. And called the mother to come with her. Yes, called the defendant's mother to assist. I mean, even when you see the video that Aldo took, because he was acting as an informant, no indication in there with any of the conversations between them that were selling this. Was a competency hearing ever broached? Pardon? Was a competency hearing ever broached? With respect to? With respect to whether or not the girlfriend who calls her ersatz mother-in-law. Her what? Ersatz. Kind of like it. That's German for kind of like it. Okay. Did anybody determine whether or not she was sufficiently intelligent or intellectually qualified to incriminate anybody? No, there was no indication of that. The record does reflect that she entered a plea to possession of a weapon without a FOID card. The mother-in-law? No, the girlfriend. That's in the record here that she received, I think, probation for that offense. So, yes, certainly she was guilty of something. But the question, and I think actually the McComb case, which the state discusses throughout its brief and which has actually vastly different facts. Would this be deemed a conspiracy of sorts or not? No, because you have to have proof of agreement. And that's one of the things we're saying is lacking. That he wanted to do this. He left. She said, I'll do it. But no indication that the two of them had agreed that she would commit the offense. Can the facts that occurred after the commission of the offense be used to show inferentially his agreement to this? Such as taking the money? Right. And the conversation the next day with Alder? I think not when you consider Stephanie's specific testimony in a trial that he never asked her to complete the sale. She didn't know where the sale was going to take place. So you're saying factually they can't be, but legally can they be? Right. There could be circumstances where that could be the case, right? In the cases that the state cites with respect to common design and shared intent, first of all, I have never seen that principle applied in situations where an accused is not present at the time of the offense. And it's typically used in a felony murder type of situation where the situation is you're there, you are engaged in acts that facilitate the offense, or you leave with the offender. But it's kind of like, and then somebody gets killed during the course of another offense. It's the principle of you're in for a dime, you're in for a dollar. But I have never seen those principles applied to a situation where the alleged offender is not present at the time. How about that is it Carozales case? Are you familiar with the Carozales case where it indicated the accomplice's presence at the scene is not prerequisite? I'm sorry? At the time is not prerequisite? It's C-A-R-R-I-Z-A-L-E-S-240-L-F-3-893. I'm not familiar with it, but was it a felony murder case? Do you know? I mean, certainly if in situations where somebody says ahead of time they were engaged in the planning of the offense together and- I think that's where the inference is. The state is asking us to draw the inference that they were- Planning. Planning. That certainly both of them were fully aware of the plan to sell this gun. Well, she was, oh, sure, she was aware of the plan, but was she involved in the planning? Certainly her testimony at trial was, I didn't do anything. I was just sitting in the car. Well, wasn't she aiding and abetting him by allowing him to use her car to transport himself to Rockford to obtain the contraband? You know, it's not even clear. Basically what we have is the defendant making declaratory statements. There's not even any indication he ever asked for permission or if he typically used her car. He said, I'm taking your car. I'm driving to- So he's submissive as well as generous. She is both of those things, Your Honor. But she, I think in this situation, too, had, and I think I said this in my brief, had she been there, sat in the car, had he completed the sale, I don't see evidence that she was participating up through the point that the sale would have taken place. Everything, according to her testimony, is he's doing this, he's going here, he's making the sale, he's planning the sale. So another issue that you brought up, you're not really arguing it much here today, was her knowledge of the material fact that he was a felon. Isn't there enough, wasn't there enough evidence or can, again, inferences be drawn from her friendship with him over those many years that she had known he was a felon? No. The evidence on that is she was asked how you know him, she called him in. She knew him for five to seven years. Well, actually, I think she said three or four and he gave a longer period of time. But she said he's a friend's friend where we used to hang out. What's your relationship? Oh, we were friends, I guess. I mean, the state could have resolved this very simply by asking her, were you aware that Aldo's a convicted felon? Well, sometimes you don't ask a question that you don't want to get, you don't want the answer to. But also, I mean, also she, when her boyfriend came out of jail, is it her husband or her boyfriend? It's her boyfriend. Boyfriend. When he came out of jail, he indicated to her that he was in jail with this individual, didn't he? I don't think that was the evidence, Your Honor. I think the evidence was that Aldo. After Defender, he and Morales lived together. Yeah, Aldo testified that he, I don't know if he knew the defendant before he was in jail, but Aldo testified that he and the defendant were together in jail sometime in 2010, and that he had told the defendant at that time he was going to be pleading guilty to a felony and going to prison. And then Aldo, I believe, also testified that after he got out of prison, he and the defendant would still see each other. I'm not even sure if he said that he and the defendant, Stephanie, would see each other. So Aldo was the source of the testimony that certainly proved the defendant was aware. Was aware of the felony conviction. Right, right. McComb is a case where they discuss several principles of accountability, and that's actually a person who's present at the scene and acts as a lookout and things of that nature, which we don't have here. But what they say with respect to accountability is that accountability focuses on the degree of culpability that the alleged accomplice has for the principal's acts. When the evidence shows that Stephanie's an independent actor, his culpability for her acts is not present. The other important factor is that accountability seeks to deter persons from intentionally aiding, abetting, or encouraging another person to commit an offense. And I think intent is the key word here, because we're lacking evidence in this record that the defendant's conscious objective was to facilitate Stephanie's commission of the offense. The state's evidence is basically he said the gun's under the hood and did something like this with his hand, which she, I don't think she had any clue what that meant. And as I said, she said, I called his mother, I left the scene because I- Incidentally, before it passed. Perhaps, but she decided I want to get rid of this gun, but no indication that I want to get rid of this gun because Roel told me to get rid of the gun. Now- Would it be fair to say that essentially your argument is there was no definitive statement relative to your client's knowledge of the status of the person she sold the gun to? Of Stephanie's knowledge of the status. That's why I said your client is Stephanie, isn't it? No, my client is Roel. I'm sorry, Stephanie. Right, right. Would you at least concede that there are facts that infer or imply that there was some sort of knowledgeable activity going on that both she and Roel, your client, knew about relative to the sale of the gun? Well, she certainly knew she was selling a shotgun. I don't think by virtue of the fact that she had known Aldo for a couple of years makes it reasonable to- Well, is there facts to infer that she was not only selling the gun, but she wasn't selling the gun on her own behalf independently of your client? Well, she told Aldo, Roel ran off and where do you want to meet? But to me, and I think just looking at the facts, uncontested facts, what that means is I'm going to do this sale now and not an indication that Roel told me to do this or that I'm- Well- Does it have to be specific? I mean, you cited the McComb case where they say that participation is not necessarily explicit and doesn't have to be explicit. I mean, did she have to convey every point to him and he every point to her in order for it to be- Well, I think you have to pile inference on inference here under the facts of this case because she didn't know where the sale was. She didn't know Edison. The evidence shows that she picked up Roel's phone and used his phone to call Aldo. So, we don't even have any indication whether she independently knew Aldo's phone number. So, it's your contention she's a voluntary interloper? That might be an appropriate way to frame it. Yes. Now, if I could sum up, I- She was just being a dutiful girlfriend. She was being a great girlfriend. I recognize, in our briefing, I recognize that the evidence certainly does show that, and looking at the charging instrument, which is how the courts have interpreted it, certainly the evidence shows that my client was guilty of an attempt under the charging instrument. So, we're asking that the greater conviction be reduced to the lesser of an attempt. Okay. Thank you so much. Thank you. Ms. Hoffman. It please the court. Counsel Lisa Hoffman, Assistant State Attorney, DuPage County. On behalf of the people joining me at council table as my colleague, Sean Kinsella. Sean what? Kinsella. K-I-N-S-E-L-L-A. I'm sorry, go ahead. I'm going to start by just saying that with the question of whether or not Mr. White is accountable for the sale of this gun, I think we've outlined in our brief sufficiently, I think the record establishes more than sufficiently, that Mr. White secured the gun in Roe v. Wade. I don't think there's any question about that. Here's a question. Does she have to know, the girlfriend have to know that this brown-eyed guy has a felony conviction in order to impugn upon White the accountability theory of unlawful sale of a weapon to a felon? I would, yes, the principal has to be able to be found guilty of the offense in order for there to be an accountability. Now, I say yes, but I now will, I don't want to say, now I'm going to qualify. It is our position as we said in our brief that the record in this instance supports the trial court's conclusion that each of the elements, necessary elements were proven beyond a reasonable doubt. And we reviewed those, and I think you reviewed them with counsel. But, you know, again, Stephanie Morales testified that she called Aldo. She recognized his voice. He testified he recognized her voice when she called him on the phone. She was using the defendant's phone, and there isn't any testimony about whether she knew the phone number or whatever. But in any event, she calls him, she recognizes his voice. She considered him, she described him as a friend's friend where they used to hang out. She says that she knew him, and it's at page 44 of the record. She said she had known him for three, five, four years as of the date of this offense, which is October of 2012. Aldo's testimony was that he met the defendant in jail in July, between July and October of 2010. So that puts it less than three years in any event when, and then when he went to prison in November, I think, of 2010. So clearly she knew that Grano before he went to prison, and she knew him after. She knew him well enough to recognize his voice. He described her as a friend. He described them as knowing each other 78 years, which might actually be the same as hers when you think of it. I'm not sure when. I didn't do the math on when his testimony was versus. But in any event, he recognized her voice. I mean, again, we have reason to, in the record, to infer that these people knew each other, were friendly with one another, and enough so to know a voice over a phone and consider each other friends. And from that, I think the trier effect can certainly infer that she knew his status as a felon. The question of whether or not, and Church-Arillo is really inopposite in this instance. Church-Arillo is talking about the status of the defendant. That's a personal thing. So in that instance, it was the accountable person who was the felon. The principal was not a felon. The act had to be different. So it is opposite of that. So I think the question of whether or not the knowledge could be imputed, whereas status can't be imputed. It's a personal matter. Could knowledge be imputed? Certainly, as we talked about this case in my office, we talked about the fact that we impute actions. I mean, if we go together to rob a bank and I sit in the car and you're not going to shoot anybody, you're just going to get the money. You know, my co-defendant shoots somebody. I'm now, you know, I didn't want that to happen. That's not what I planned. That's not how it went. But his actions are imputed to me. But I guess the bigger, my position is we don't need to really get to that because the record in this case is sufficient to support the trial court's finding on that fact, on that element of the offense. And I suppose if there's, if there isn't, if there are no questions regarding the actual accountability, then I'm going to stand on my brief and ask that you affirm the conviction. Any questions? Well, he's thinking one up. Hold on. Is there any question as to whether or not Mr. White, the defendant, did or did not know that the purchaser was a felon? I think that my answer to that is no. Does that matter? Well, it matters if one were, on this record, no. If one were going to venture into the question of whether or not you impute his knowledge to her if there wasn't sufficient evidence of her knowledge. But I do think the record indicates that the, I believe that Mr. White and Mr. Grano were in jail together. And during that period of time, Mr. Grano went to prison. The defendant has a prior record in the Department of Corrections, and therefore I would suggest that all that together suggests that he would know that when you're going to prison, you've committed a felony. So if Mr. Grano went off to prison, Mr. White would then know Mr. Grano was going there because he's a felon. Yeah, Mr. White knew. No, right. And that was your question. Is there evidence in the record that Mr. White knew? So I think the answer is yes. I don't think that's germane because we don't need that in this instance. But, again, to the extent that one were wanting to impute his knowledge to her. Can you infer, or can you infer, was, as a matter of fact, asked to infer the fact that she lived with White, that she and White may have exchanged knowledge? Oh, of course. I mean, right. Again, that's another factor that is in, you know, again, of the facts in the record. And I didn't mention that, but it is true. They lived together. They lived together at the time that Mr. Grano got out of prison and made the deal with the defendant who saw the gun. So, yes. Nothing else? No. You sure? Yeah. Without levity, yes, I'm sure. Thank you. Thank you. This is very briefly, Your Honors. The state agrees that there has to be a showing that the principal had the knowledge, necessary knowledge. And I think if being a friend of someone who's a convicted felon makes it apparent that you know that that person's a felon, I think a lot of people would be in serious trouble. Certainly, recognizing each other's voices doesn't establish that she knows he's a felon. With respect to, I'd just like to make a comment about the idea of shared intent or common design. Certainly, Roell intended to sell this weapon. Stephanie not only intended to sell it, but she did sell it. But shared intent has a component of there's an agreement between the two of them that Roell wants her to commit this offense. And there's no evidence of this. I mean, people could have the same intent with respect to a particular act, but do it independently. Isn't that unreasonable, though, for the trier fact to make an inference that she's in the car with him knowing he's going to sell this gun? He jumps out of the car and says the gun's in the hood, leaves his phone behind. She reaches out to the guy, sells the gun, comes back and gives him the money. I mean, how is that an unreasonable inference to say that it was his intent for her to carry through with the sale? I'm still perplexed as to why the mother-in-law came in. Yeah. The mother-in-law certainly was very open about her status as a felon. But there's no indication. In fact, in this case, there's no indication that Roell needed her to complete this sale. In fact, the evidence was that he had already, at Aldo's request, had kicked it over for a day. There's no indication that this is an offense where time is of the essence and it has to be completed at that time. So, I don't think it's reasonable to suggest that he Would you say that the contract that you claim was never perfected or completed was $250 for a shotgun and for some shells? The contract, as far as the record shows, was that Roell was going to sell him a gun, Aldo a gun, and Roell didn't sell him a gun, but that Stephanie did. Well, wasn't there a conversation thereafter that the purchaser conversed with the client and asked where the bullets were? And he said, don't worry, I'll get them to you? Sure, but that doesn't establish that Stephanie was acting at his behest. I'm saying, doesn't that mean that the contract was for a shotgun and X or an indeterminate number of shells for $250? The conversation was, I think, more in the nature of what good is this shotgun without the shells and the dude wants to bust it off to make sure it works, something like that. So, I don't know that there were any specifics with respect to the prior conversations as to the shells. But, you know, two people can share an intent. I mean, I think of something like two people can both say they're going to vote for a particular candidate. You can announce, I'm voting for Donald Trump, and the other person says, oh, I'm going to vote for Donald Trump. That doesn't mean that you're accountable for the second person's vote. That could be criminal. I would have to agree with that. So, what we're missing here is the proof of an agreement between Rowell and Stephanie. And what the evidence shows is an independent act on her part that she, sure, she certainly wasn't good judgment on her part. But she did this of her own volition and not at his request or direction. So, again, we would ask that his conviction be reduced. Thank you so much. Thank you. Anything further? I'm sorry. No, thank you. All right. Thank you so much. Thank you so much for being here today and giving us your argument. We appreciate your time. The case was taken under consideration as a decision remedy in due course. We are adjourned for the day. Thank you so much.